Diane E. BAILEY, Plaintiff,

v.

SYNTHES, et al., Defendants.

No. 00 CIV.7880 LTS JCF.

United States District Court,
S.D. New York.

Dec. 16, 2003.

By Sean J. Conway, Islandia, NY, for Plaintiff.

Pepper Hamilton LLP, By Anthony B. Haller, Philadelphia, PA, for Defendants.

### OPINION AND ORDER

SWAIN, District Judge.

Defendants in this employment discrimination case move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing Plaintiff's claims. By a separate motion, all defendants other than Synthes (USA) move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing the complaint as against them for failure to state a claim upon which relief can be granted.

In her complaint, Plaintiff asserts that Defendants violated Title VII of the Civil Rights Acts of 1964, as amended ("Title VII"), 42 U.S.C.A. section 2000–e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. section 621 *et seq.*, and the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law section 290 *et seq.*, in connection with the terms and conditions of her employment. Plaintiff also asserts a breach of contract claim based on New York state common law. The complaint further asserts that Defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. sections 12101 *et seq.*, in connection with the events that are the subject of this action, but Plaintiff has withdrawn the ADA claim. (Pl's Opp'n to Summ. J. at 1.)

The Court has subject matter jurisdiction of Plaintiff's Title VII and ADEA claims pursuant to 28 U.S.C. section 1331,

and of the state law claim pursuant to 28 U.S.C. section 1367.

The Court has considered thoroughly all submissions in connection with the instant motions. For the following reasons, Defendants' motion for summary judgment is granted. In light of the Court's resolution of Defendants' summary judgment motion, the Court need not address Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

### BACKGROUND

*Bailey's Employment with Synthes*

The following facts are undisputed unless characterized otherwise. Plaintiff Diane E. Bailey ("Plaintiff" or "Bailey"), a woman born in 1955, began her career at Synthes (USA) ("Synthes") in 1987 as a Sales Consultant, when she was thirty-two years old. (Bailey Dep. at 10, 140.)[1] Synthes develops, manufactures, and sells orthopedic trauma implant devices for operatively treating bone fractures. (Bailey Dep. at 128.) As a Sales Consultant, Bailey's job duties included calling on orthopedic surgeons and hospitals to promote and sell Synthes' orthopedic devices, assisting surgeons and hospitals in using Synthes equipment, maintaining hospital inventory, developing relationships with customers, and communicating regularly with the Regional Manager at Synthes. (Bailey Dep. at 13–132, 169, 171, 173.)

Bailey was initially assigned to the Long Island territory of the Greater New York Sales Region. (Defs.' Local Rule 56.1 Statement ("DR56.1") at 7.) At that time, she reported to Richard Gennett ("Gennett"), the Regional Sales Manager for

---

**1.** Although Plaintiff has named as defendants a number of Synthes-related entities and argues that she is unsure of the relationships among them and their respective relationships to her employment, the evidence of record concerning her employment indicates that Synthes (USA) was the relevant employer. Plaintiff has proffered no evidence from which a jury could find that she was employed by any of the other defendants. (*See* Bailey Dep. at 29–31.)

Synthes' Greater New York Region. (Gennett Dep. at 15, 16.) In 1989, Gennett transferred Bailey to the Manhattan territory at Bailey's request. (Bailey Dep at 17, 19.)

At a sales meeting in 1991, Hansjoerg Wyss ("Wyss"), Synthes' CEO, gave a slide presentation of his recent vacation in Bhutan during a sales meeting. Some of the slides depicted representations of male sex organs painted on native buildings. Bailey construed Wyss' action as indicative of insensitivity to and disrespect for the female employees. (Bailey Dep. at 456.) At another sales meeting in 1992, Wyss danced suggestively with a female sales representative, and a group of unidentified male managers and salespeople threw their hotel room keys down on the floor in front of the female representative. (Bailey Dep. at 462–465.)

In 1993, during a hospital visit, Gennett described to Bailey his prior sexual experiences with a nurse. (Bailey Dep. at 467–469.) Bailey further contends that, at some unspecified time during her employment by Synthes, two of her fellow sales consultants, John Nieradka and Eli Sakellakis, told her that Gennett had once said that Bailey "appeared to be depressed and under a severe amount of pressure" and that it was in Gennett's estimation due to the fact "that she hadn't had sex in a long time or that she was thinking she was gay." (Bailey Dep. at 372–374.)

Thomas Pendlebury ("Pendlebury") became Synthes' Regional Sales Manager for the Greater New York Sales Region in 1994. (Pendlebury Dep. at 8.) As Regional Sales Manager, Pendlebury supervised Bailey and reported to Gennett, who had been promoted to National Sales Manager. (Pendlebury Dep. at 19, 22.) Also in 1994, a "SUSA Sales Outlook Report" prepared by Gennett was presented to Synthes' Board of Directors. That report reviewed Synthes' national sales results and forecasts, identified a perceived need for strengthening of the sales force and sales management team, described a consolidation of regional management, and included the following paragraph, which Plaintiff contends is indicative of age discrimination:

> We will also have to take a harder look at the commitment and effectiveness of our sales consultants. Many are still good but have achieved an income level that has diminished their drive. We will have to look at territory reductions and hire young, hungry new consultants to fuel the fires. We will also have to quickly identify those consultants whose strengths do not match the requirements of the job and allow them to seek employment elsewhere. These processes must be done skillfully.

Defs. Ex. 21.

Until 1995, the year in which Bailey turned 40, Bailey handled the entire Manhattan territory. (Pendlebury Dep. at 23–24.) In that year Pendlebury realigned, or divided up, the Manhattan territory into two territories: Manhattan East and Manhattan West. (Bailey Dep. at 313–322.) After the realignment, Bailey was assigned to Manhattan West. Kevin Nolte, a male in his twenties, was hired to service Manhattan East. (Bailey Dep. at 269; Nieradka Dep. at 37.) Although Bailey testified at her deposition that, when told of the Manhattan realignment, she believed that it would result in a 50% reduction of her income (Bailey Dep. at 322), she has not proffered any evidence as to her actual post-realignment income.

Defendants assert that territory realignment is an established business practice at Synthes, specifically that additional sales consultants are introduced into a sales region to provide better service to existing customers, penetrate new markets, and defend against competitive activity. (Defs.

Ex. 4 at 1.) Pendlebury testified that he believed that sales consultants would continue to do well after territory realignments because realignments allow sales consultants to focus on key accounts and provide better service. (Pendlebury Dep. at 45.) Pendlebury further testified that he realigned the Manhattan territory in 1995 due to its large number of hospitals and operatively treated fractures, the fact that only one person (Bailey) covered it at the time, and concerns of Bailey's previous supervisor about her organizational and customer relations skills. (Pendlebury Dep. at 23–25.) Bailey argues generally that the realignment process is unfair to older women, (Pl.'s Local Rule 56.1 Statement ("PR56.1") ¶ 14), but has not proffered any evidence other than the 1994 Gennett Sales Outlook Report memorandum (Defs.Ex. 21) to controvert Defendants' explanation of the reasons for the realignment.

A number of complaints concerning Bailey's performance were lodged beginning in or about 1995. In early 1995, Synthes received complaints from three physicians regarding Bailey's lack of responsiveness. (Defs.Ex. 11.) Bailey does not deny that there were complaints and problems, but asserts generally that the problems were not serious. Bailey also asserts that the physicians from whom complaints were received had business affiliations with the Swiss manufacturer of the products distributed by Synthes and therefore had an incentive to support what Bailey perceives as Synthes' efforts to get rid of her. (Pl. Ex. 1 ¶¶ 14–16; see also Gennett Dep. at 20–25.)

Defendants also allege that Bailey's sales performance was sub-par in 1995, and that there was negative growth in her territory in that year. (Defs.Ex. 12.) Bailey asserts generally that sales quotas were set arbitrarily, often to the detriment of high-volume, more experienced sales consultants (PR56.1 ¶ 51), but offers no specific evidence to support this claim.[2] Bailey failed to complete her account plans in 1995, an administrative task required of all sales consultants. (Defs.Ex. 12.) Defendants assert that Bailey did not reliably respond to e-mail and pager messages. (Defs.Ex. 13.) Bailey admits that she did not regularly read her e-mails and that she was having problems with her pager but did not switch service companies. (Bailey Dep. at 294, 295.) Bailey further asserts that she did not read e-mail messages toward the end of her tenure with Synthes for fear that, if she did read them, Defendants would gain access to her computer and "wipe out" her hard drive. (Pl.Ex. 1 ¶ 10.) It is undisputed that, when she left Synthes, she had 400 unread e-mail messages. *Id.*

In 1996, Pendlebury met with Bailey to discuss her alleged performance problems. (Bailey Dep. at 345, 356–357.) After this conversation, Pendlebury scheduled a meeting at Paoli, Pennsylvania, where Synthes is headquartered, with Carol Costello ("Costello"; also known as Carol King). (Pendlebury Dep. at 60.) On January 22, 1996, Bailey met with Pendlebury and Costello at Paoli, Pennsylvania. (Bailey Dep. at 362.) During this meeting, Bailey was given a letter outlining her performance problems. (DR56.1 ¶ 81). Bailey also met with Costello privately and told Costello that she felt Pendlebury was placing her under unfair scrutiny. (Bailey Dep. at 365).

---

**2.** Indeed, the Gennett deposition testimony cited by Plaintiff in support of this argument indicates that high-volume sales people were assigned goals that were lower as a percentage of overall sales than those assigned to sales people with smaller overall sales figures. (*See* Gennett Dep. at 48–52, Pl's Ex. 5.)

Bailey alleges that, during her meeting with Costello, she had told Costello that she had learned that Gennett had made sexually disparaging remarks about her, and that she believed that both Gennett and Pendlebury were aware that Bailey knew of Gennett's alleged remarks. (Pl. Ex. 1 ¶ 22.) Bailey also asserts that, the night before the meeting with Costello, Bailey confronted Pendlebury and accused him of harassing her with a barrage of complaints and useless paperwork because she is an older woman. *Id.* After the Paoli meeting, on February 4, 1996, Bailey sent an e-mail message to Pendlebury, describing ways in which she intended to improve her performance, and Pendlebury responded by sending Bailey a list of performance objectives on March 15, 1996. (Bailey Dep. at 389–390, 396.) For the next year-and-a-half, Defendants allege, Bailey's performance problems nonetheless continued.

In a May 16, 1996, memorandum to SUSA Regional Managers regarding "Synthes Guidelines for Territory Expansion and Realignment," Charlie Hedgepeth ("Hedgepeth"), another senior Synthes manager, stated that decisions about expansion and realignment were to be made "without regard to race, national origin, sex, religion, age, veteran status, disability or any other factor prohibited by . . . law." With respect to a connection between sales consultant performance and territory reductions, the memorandum read in pertinent part: "[s]ome sales consultants will function better and achieve better results if their territories are reduced to allow them to focus on a customer base. Decisions based on these factors will be reviewed by Senior management in conjunction with Human Resources." (Defs. Ex. 4 at 2.)

Defendants allege that Bailey never improved her performance sufficiently. Although her performance improved in the beginning of 1996 after the Paoli confer-

ence (Defs.Ex. 20), it declined again by the end of 1996. (Defs.Ex. 26.) These problems included declining sales, failure to meet quota, and continued problems with administrative duties. (Defs.Ex. 26.) Bailey does not offer any specific evidence to counter Defendants' assertions of declining sales except to reiterate her assertion that Defendants' sales quota system is arbitrary. (PR56.1 ¶ 116.) Defendants further allege that Synthes continued to receive numerous complaints from Bailey's customers. (DR56.1 ¶¶ 104, 109, 113 and evidence cited therein.) Pendlebury is also alleged to have received a complaint from another sales consultant at Synthes that Bailey failed to return evaluation equipment that she had borrowed from him. (DR56.1 ¶ 114 and evidence cited therein.) Defendants further assert that Bailey failed to schedule customer meetings during Pendlebury's 1997 field visit into her area. (DR56.1 ¶¶ 111–112 and evidence cited therein). Bailey does not specifically dispute the existence or basis of the complaints, although she asserts that they were minor and/or motivated by discrimination. (*See* PR56.1 ¶¶ 104, 109, 111–114.)

At a 1997 sales meeting, when Pendlebury was passing out cigars to sales consultants, he gave Bailey a smaller cigar than those given to male consultants. (Bailey Dep. at 473.)

In July 1997, Gennett and Pendlebury met with Bailey and informed her that two additional hospitals would be taken away from her accounts. (Bailey Dep. at 436, 441–443.) Bailey was also informed shortly thereafter that she was being put on probation for 90 days. (Bailey Dep. at 445.) On July 11, 1997, Bailey sent an e-mail message to Pendlebury informing him that she would be taking a two-week vacation, effective that day. (Defs.Ex. 36).

Bailey began working for another employer in August 1997. (Bailey Dep. at 65.) On August 4, 1997, Bailey faxed a letter to Gennett, informing him that she considered herself terminated as of August 1, 1997, because, *inter alia,* the territory reductions had diminished her annual income from $200,000 to $25,000. (Defs. Ex. 37.) On January 21, 1998, Bailey filed a charge with the Equal Opportunity Commission ("EEOC"), alleging that she had suffered discrimination on the bases of sex, age, disability and had been the victim of retaliation. (DR56.1 ¶ 134.; Defs. Ex. 2.) The charge cover sheet indicated that it was also being filed with the New York State Division of Human Rights. According to Plaintiff, the EEOC later referred the charge to the analogous Pennsylvania agency. (Pl.Ex. 1 ¶ 27.) The EEOC issued Plaintiff a right to sue letter on or about August 24, 2000 (Pl.Ex. 18.) and, on October 17, 1998, Bailey filed her complaint in this Court. (Pl.Ex. 3.)

Defendants assert that the 1998 sales for Bailey's remaining accounts were $1.2 million, which would have resulted in $185,000 in compensation for Bailey. (DR56.1 ¶¶ 127, 128.) Bailey asserts in an affidavit that, historically, her remaining accounts had generated only $500,000 in sales annually, but does not dispute the actual 1998 sales figure proffered by Defendants. (*See* Pl.Ex. 1 at ¶ 5.)

*Bailey's Claims*

Bailey asserts that both the territory realignment in 1995 and the removal of two hospitals from her account in 1997 were the product of a deliberate effort on Synthes' part to purge the sales force of older employees. (Pl.Ex. 1 ¶ 4.) She points out that in both instances the accounts taken away were given to a younger man, Kevin Nolte, at a time when she was 40 or older. (Bailey Dep. at 269, 442.) Bailey

also cites Gennett's 1994 SUSA Sales Outlook Report[3] as evidence of such a policy, and argues that the 1996 Hedgepeth memorandum was generated only to cover up the discriminatory 1994 memorandum. (PR56.1 ¶ 74.) Bailey further relies on deposition testimony from a former Synthes employee to the effect that there was a general understanding among Synthes' employees that older employees would be cut because "they [Synthes] know that a 40 year old can't get a job as easy" (Sakellakis Dep. at 33, 34), and proffers copies of several complaints filed by other Synthes employees alleging age and/or gender discrimination. (PR56.1 ¶ 74, Pl.Ex. 8–12.)

Bailey also alleges that Defendants had created a hostile work environment in which she experienced age and gender-based discrimination. She cites Nieradka and Sakellakis' alleged repetition to her of Gennett's comment, Wyss' display of the Bhutan slides at the 1991 sales meeting, Wyss' 1992 suggestive dancing with another female employee at a sales meeting, Gennett's 1993 description to her of his sexual experience with a nurse, Pendlebury's distribution to her of a cigar smaller than those given to Bailey's male colleagues at the 1997 sales meeting and allegations of sex discrimination by other female employees. (Pl.Ex. 3 ¶¶ 40–45, 50, Pl.Ex. 1 ¶¶ 8, 9.) Bailey also asserts that the territory reductions were the product of ageism, which, though not explicitly mentioned by Bailey in the context of her hostile environment claim, may also be considered part of the landscape of conduct that created the allegedly hostile work environment.

Bailey contends that the 1997 reductions in her territory were made in retaliation for her complaints to Carol Costello concerning Gennett's alleged sexist comments

---

**3.** Defs. Ex. 21.

and her complaint to Pendlebury that his criticisms of her were the product of age and sex discrimination, and further alleges that Defendants' actions constituted breach of an employment contract.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute about a material fact and summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In viewing the evidence for the purposes of summary judgment, the Court will "assess the record in the light most favorable to the non-movant" and draw all reasonable inferences in favor of the non-movant. *Weinstock v. Columbia University,* 224 F.3d 33, 41 (2d Cir.2000). "Conclusory allegations, conjecture, and speculation," however, are not sufficient evidence to demonstrate a genuine dispute of fact. *Kerzer v. Kingly Manufacturing,* 156 F.3d 396 (2d Cir.1998). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Timeliness of Plaintiff's Claims

Plaintiff's claims of age and sex discrimination and retaliation are asserted under Title VII, the ADEA and the NYHRL, each of which has its own limitations provision.

### NYHRL Claims

Claims asserted under New York's Human Rights Law must be brought within three years of the alleged discriminatory action. N.Y. Civ. Prac. L. & R. § 214 (McKinney's 2003); *Walker v. Connetquot Cent. School Dist. of Islip Cent. Offices,* No. 99–9318, 2000 WL 821745, at *2 (2d Cir. June 21, 2000). Bailey filed suit in this Court on October 17, 2000. Thus, only conduct or events occurring after October 17, 1997, are actionable under the NYHRL. Because Bailey had already left the employ of Synthes by that date, all of her NYHRL claims are time-barred. Accordingly, all of Plaintiff's NYHRL claims will be dismissed as against all Defendants.

### Title VII and ADEA Claims

Claims under Title VII and the ADEA must first be asserted in charges filed with the EEOC. Such charges must be filed with the EEOC within 300 days of the alleged unlawful employment practice if the claimant has initially filed a claim with a state agency, or within 180 days if she has not. 42 U.S.C.A. § 2000e–5(e)(1) (West 2003); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (Title VII); *Murphy v. General Electric Co.,* 245 F.Supp.2d 459, 469 (N.D.N.Y.2003) (ADEA). Bailey filed her charge with the EEOC on January 21, 1998. As noted above, she marked her EEOC complaint form as also filed with the New York State Division of Human Rights and has presented evidence that the EEOC referred the complaint to the Pennsylvania human rights agency. The applicable look-back period thus appears to be 300 days, and the parties have argued the impact of the limitations provision on the assumption that the 300–day period applies to Plaintiff's Title VII and ADEA claims.

Applying the 300–day template to Plaintiff's allegations, the only specific adverse

conduct by Synthes that is alleged to have occurred within the statutory period is the July 1997 removal of two hospitals from Bailey's Manhattan East territory.[4]

■ Bailey argues, however, that Defendants' actions taken outside the 300–day period are nonetheless actionable on a "continuing violation" theory or because they created a hostile work environment that continued through her termination of employment. Under the continuing violation principle as explicated by the Second Circuit, the limitations period is extended "for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (internal quotation marks and emphasis omitted). "Multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation" under these principles, although a "continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* at 765–66 (internal quotation marks omitted).

In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court held that the continuing violation doctrine does not apply to a series of discrete discriminatory acts. "Discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113, 122 S.Ct. 2061. Each discriminatory act starts a new clock for filing charges, although "the existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." *Id.* Thus, Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory period." *Id.* at 105, 122 S.Ct. 2061. This preclusion similarly applies to ADEA claims based on events outside the statutory period. *See Coffey v. Cushman & Wakefield, Inc.*, No. 01 Civ. 9447 (JGK), 2002 WL 1610913, at *3 (S.D.N.Y. July 22, 2002). An employee may, however, use prior acts "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061.

■ It is clear from *Morgan* and the relevant Second Circuit case law that the territory reductions, the allegedly unwarranted criticisms, and the crude sexist statements are discrete acts that cannot be lumped together to form a "continuing violation." The *Morgan* Court did not define exactly what it meant by "discrete discriminatory acts," but offered termination, failure to promote, denial of a transfer, and refusal to hire as examples of the kinds of employment actions that would qualify. In addition, "well-settled law in [the Second

---

4. Plaintiff alleges in her opposition brief "[t]hat in around 1997, [Synthes] refused to provide her products to use in her sales to surgeons and the same products were provided to young men in the area." (Pl. Mem. in Opp. at 8.) The possibility exists that some or all of the alleged conduct could fall within the limitations period. The Court is unable to determine the timeliness of any related claim because Plaintiff fails to provide information as to whether the conduct allegedly occurred before or after March 27, 1997. Because, however, Plaintiff fails to provide any evidentiary support whatsoever for her contention, she has failed in any event to raise a triable issue of fact as to whether she is entitled to pursue a claim regarding this alleged conduct.

Circuit] under the 'continuing violation'" doctrine, predating the *Morgan* decision, dictates that 'discrete acts' include allegedly discriminatory transfers, job assignments and non-promotions, and failures to compensate adequately." *Costanzo v. The United States Postal Service*, No. 00 Civ. 5044, 2003 WL 1701998, at *5 (S.D.N.Y. Mar.31, 2003) (citations omitted). The actions of which Plaintiff complains in this case are clearly analogous.

Hence, the "continuing violation" doctrine does not apply and, as a result, none of Plaintiff's Title VII and ADEA disparate treatment or retaliation claims arising from actions taken by Defendants prior to March 27, 1997, is actionable.

■ Hostile work environment claims, on the other hand, are treated differently for limitations analysis purposes. *See Morgan*, 536 U.S. at 115, 122 S.Ct. 2061. "Their very nature involves repeated conduct." *Id.* Thus, if one act contributing to the hostile work environment claim occurred within the statutory period, other acts contributing to the same claim may be considered in determining liability, even if they occurred outside the statutory period. *Id.* at 117, 122 S.Ct. 2061. In analyzing Plaintiff's hostile work environment claim, the Court will therefore consider all of the events that are alleged to have contributed to the hostile work environment, and, if Plaintiff has proffered facts sufficient to support a finding of a hostile work environment, the entire course of conduct, including events that occurred outside the statutory period, may be considered in assessing her claim for relief. *Id.*

*Amenability to Suit of Defendants Other than Synthes (USA) Under Title VII and ADEA*

■ Plaintiff asserts her Title VII and ADEA claims against Richard Gennett, Thomas Pendlebury, and Hansjeorg Wyss in their individual capacities. Individual supervisors are not "employers" amenable to suit under Title VII or the ADEA. *Houston v. Fidelity (Nat'l Fin. Servs.)*, No. 95 Civ. 7764, 1997 WL 97838, at *8 (S.D.N.Y. Mar.6, 1997). Accordingly, Plaintiff's Title VII and ADEA claims against these individuals will be dismissed. Plaintiff has offered no evidence that she was employed by any entity other than Synthes (USA) or that any such entity took any employment-related action in connection with the events of which she complains. Accordingly, Plaintiff's claims against defendants "Synthes," Synthes, Inc., Synthes, North America, Inc., Synthes Spine, Inc., MSNA, Inc. and Wyss Foundation will also be dismissed.

*Constructive Discharge*

■ Constructive discharge is actionable under Title VII and ADEA, subject to proof meeting the requirements of the *McDonnell Douglas* burden-shifting test discussed *infra*. Because Bailey's proffered evidence is insufficient as a matter of law to establish that a constructive termination occurred, the Court will address this claim prior to engaging in a more general analysis of Bailey's claims of age- and gender-based disparate treatment. A constructive discharge has occurred when "an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir.2000).

■ Bailey asserts that the reduction in her income arising from restructuring of her territory and reassignment of hospitals, together with what she characterizes in her memorandum of law as "working

conditions of constant harassment from Thomas Pendlebury" made her working conditions so intolerable that a reasonable person in her position would have left the employment. (Pl. Br. in Opp. at 7–8.) As to income issues, Plaintiff has neither proffered specific facts regarding her sales and income nor controverted Defendant's evidence that even her post–1997 reduced territory produced sufficient sales in 1998 to support an income of $185,000, which is hardly an offensive level of compensation. Nor, despite her characterization of performance-based criticisms as harassment regarding petty matters and her imputation of base motives to complaining client physicians, has Plaintiff controverted the factual assertions underlying the performance criticisms. Further, "a constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work." *Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993). Under these circumstances, and even taking into account all of Plaintiff's assertions regarding negative treatment by Synthes and its representatives in the post–1994 time frame, no reasonable fact finder could determine that Bailey's "[w]orking conditions [were] ... so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Accordingly, and for the reasons discussed below in connection with Bailey's other disparate treatment claims, Defendants' motion for summary judgment will be granted insofar as it relates to Plaintiff's claim of constructive discharge.

*Disparate Treatment Claims*

 The burden-shifting framework of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 414 U.S. 811, 94 S.Ct. 31, 38 L.Ed.2d 46 (1973), is employed in evaluating sex discrimina-

tion claims under Title VII as well as age discrimination claims under ADEA. *Weinstock v. Columbia University,* 224 F.3d 33, 42 (2d Cir.2000); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Id.* Bailey has arguably satisfied her *prima facie* burden with respect to her claims arising from the July 1997 reduction in territory which, as noted above, is the only adverse employment action alleged to have been taken place within the applicable 300–day time frame.[5] Bailey is female and was over 40 at the time, and the fact that Synthes continued to give her responsibility for accounts even after the reduction is indicative of her qualification to work as a sales representative. Finally, the accounts taken away from her were given to Kevin Nolte, a male sales consultant who was well under the age of 40. (Bailey Dep. at 442.) Replacement "by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001).

 A defendant can rebut the *prima facie* case, which gives rise to a presumption of discrimination, by showing a legitimate and non-discriminatory reason for the action. *Weinstock,* 224 F.3d at 42. Defendants claim that Synthes reduced Bailey's territory because of her poor performance. (DR56.1 ¶ 118.) In support of this contention they have proffered evidence of complaints from physicians regarding Bailey's lack of responsiveness,

5. *See supra* note 4.

Bailey's failure to meet sales quotas and to perform administrative tasks, and Bailey's failure to respond to e-mail messages and pages. (DR56.1 ¶ 116.) Synthes has also provided evidence of a general business strategy of reducing and reassigning territories in order to boost sales by motivating the sales force to make territories more productive. Because Synthes' proffered reasons are facially both legitimate and non-discriminatory, the presumption of discrimination arising from the *prima facie* case drops away and Bailey must come forward with evidence to show that Defendants' reason is a mere pretext, and that it is more likely than not that sexual and/or age discrimination was at the root of the territory reduction. *See Weinstock*, 224 F.3d at 42.

▮ Bailey does not deny Defendants' allegations of poor performance, but contends that they are mere pretexts for Synthes' efforts to discriminate based on sex and/or age. (PR56.1 ¶ 47.) Bailey points in this regard to the reference in Gennett's 1994 Sales Outlook Report to recruiting "young, hungry new consultants to fuel the [sales] fires," her own assertions concerning the relative paucity of women in Synthes' sales force and the filing of discrimination charges against Synthes by others claiming sex and/or age discrimination (*e.g.*, PR56.1 ¶ 82). These proffers are, individually and collectively, insufficient to rebut Synthes' showing of legitimate nondiscriminatory reasons for the territory reductions. Given the overall context of the 1994 Gennett report, which focused on sales volume and productivity, the "young, hungry new consultants" phrase is an insufficient basis for a jury finding that Synthes' attribution of its actions to Plaintiff's admitted failures to meet quotas and documented performance issues is pretextual. Plaintiff's anecdotal evidence concerning relative numbers of women and men in Synthes' sales force is similarly insufficient to frame a genuine

issue of material fact as to pretext. The Court has also reviewed the various EEOC charges and complaints by other Synthes employees on which Plaintiff relies in seeking to show that Synthes' proffered reasons for the restructuring are pretextual. These complaints, which are largely unsworn and therefore of little if any evidentiary value in any event, focus on the individuals' own experiences with the Synthes restructuring. All contain broad, general assertions that Synthes' actions were motivated by age and/or sex discrimination, relying as to the age discrimination issue on the 1994 Gennett report. Only one complaint cites particular, allegedly discriminatory statements by a manager; the manager was not one with whom Plaintiff is alleged to have been in any sort of supervisory or other working relationship. As in the instant case, the company appears to have cited performance problems in connection with the challenged reductions. Also as in the instant case, the complaining parties asserted that Synthes' standards were unfair and/or pretextual. In the absence of specific, admissible, evidence of facts bearing on Plaintiff's experience with Synthes, other employees' allegations that their adverse employment experiences were the product of discrimination are insufficient to rebut Defendants' proffered reasons for reducing Plaintiff's territory. *See Scaramuzzo v. Glenmore Distilleries Co.*, 501 F.Supp. 727, 733 (N.D.Ill.1980) (although evidence of discriminatory acts by employer toward employees other than plaintiff is relevant under certain circumstances, "[t]he fact that persons other than the plaintiff filed age discrimination charges against [employer] ... is of minimal probative value"); *see also Stair v. Lehigh Valley Carpenters Local Union No. 600*, 813 F.Supp. 1116, 1119 (E.D.Pa.1993) (in an employment discrimination case based on disparate treatment, evidence of discrimination

directed at employees other than plaintiff that involves "[i]ncidents that are too remote in time or too dissimilar from a plaintiff's situation are not relevant"). Nor are the sexist remarks attributed to Gennett, one of which apparently alluded (albeit crudely) to Plaintiff's productivity problems, indicative of falsity or pretext insofar as Synthes' justifications for the territory reductions and performance criticisms are concerned.

Bailey also asserts that the physicians' complaints, while not factually unfounded, were somehow engineered by Synthes or its affiliate for the purpose of carrying out Synthes' alleged discriminatory plans against Bailey. Bailey has not, however, presented any evidence that any of the complaints was solicited by Synthes, or even that any of the complaining physicians had such a close relationship with Synthes management that a reasonable trier of fact could conclude that the physicians could have been recruited by Synthes to fabricate complaint letters. Furthermore, Bailey does not deny that she had problems with the client physicians from time to time. (PR56.1 ¶ 47.)

Finally, Bailey asserts that sales quotas at Synthes were set arbitrarily and tended to be unfair to older sales consultants with higher sales from previous years. (PR56.1 ¶ 116.) However, no evidence besides Bailey's own conclusory assertion was offered to support this contention. Bailey has also acknowledged that, prior to the 1997 territory reduction, she had not read her e-mail for months and that she had had longstanding problems with her pager service. (Bailey Dep. at 294, 295.) Nor has she offered any evidence that tends to show that her performance prior to the reduction was at an acceptable level.

For these reasons, the Court finds that Plaintiff has failed to proffer evidence sufficient to support a finding that Defendants' asserted reasons for the adverse

employment actions were pretexts for age and/or sex discrimination. There is thus no genuine issue of material fact for trial with respect to Plaintiff's disparate treatment claim, and Defendants' summary judgment motion will therefore be granted with respect to that claim.

*Hostile Work Environment*

 Bailey also alleges that she was subject to a hostile work environment at Synthes that was motivated by ageism and sexism. An actionable hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). When the discrimination is based on sex, Title VII is violated. *See id.* If the discrimination is based on age, ADEA is violated. *See Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310 (2d Cir.1999). Only conduct that is severe or pervasive enough to create an objectively hostile or abusive environment which the plaintiff also finds subjectively to be abusive is actionable. *Harris*, 510 U.S. at 21, 114 S.Ct. 367. Whether an environment is hostile or abusive can be determined by examining the totality of the circumstances; important factors in the determination include: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. "Isolated, minor acts or occasional episodes do not warrant relief." *Brennan*, 192 F.3d at 318. In order to survive summary judgment, the plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to

**358**

have altered the conditions of her working environment." *Whidbee*, 223 F.3d at 69.

 Bailey asserts that the following incidents, the occurrence of which is undisputed by the Defendants, created a hostile working environment based on sex: Wyss' 1991 display of images of male genitalia in his slides from Bhutan, Wyss' 1992 sexually suggestive dancing with another female staff member, Gennett's pre–1995 recounting to Bailey of his sexual experience with a nurse, and Pendlebury's 1997 distribution to Bailey of a cigar smaller than the cigars he provided to her male colleagues. (PR56.1 ¶ 136.) These incidents are neither severe nor pervasive enough to meet Bailey's burden of showing that her working conditions were thereby altered. The incidents were infrequent and isolated. They were not physically threatening to Bailey. Finally, the incidents all occurred outside of Bailey's daily work routine and there is no evidence to show that they affected her work performance. Thus, this Court finds that summary judgment in favor of Defendants on Bailey's hostile environment claim based on sex is appropriate. *See Quinn*, 159 F.3d at 768 (court affirmed district court's grant of summary judgment in favor of defendant with respect to plaintiff's hostile work environment claim, finding that the actions of plaintiff's supervisor, who on separate occasions allegedly commented that plaintiff had been voted the "sleekest ass" in the office and deliberately touched plaintiff's breasts, were not sufficiently severe to create a hostile work environment); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir.1995) (court reversed jury verdict in favor of plaintiff, finding that the actions of plaintiff's supervisor, who allegedly engaged in sexually offensive conduct on nine separate occasions over a seven month period, including making repeated

references to plaintiff as "pretty girl", grunting in reaction to Plaintiff's wearing of a leather skirt in the office and making gestures suggestive of masturbation during a conversation with plaintiff, were not severe enough for a rational jury to conclude that they created a hostile work environment); *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261–63 (10th Cir.1998) (court affirmed district court's grant of summary judgment in favor of defendant on hostile work environment claim where supervisor allegedly asked plaintiffs if they ever had sexual dreams, took plaintiffs out to a Hooter's restaurant while on a business trip, made remarks relating to plaintiff's bra strap and underclothing, made references to the roof of a mall being shaped like a woman's breasts, made repeated efforts to look down plaintiff's blouse and needlessly touched plaintiffs on multiple occasions, finding that the incidents, which were spread out over three years, "were too few and far between" to be considered sufficiently severe).

Bailey also asserted that the work environment at Synthes was permeated with age bias. However, she did not proffer any facts, other than her attribution of territory reductions to ageism, that would support this claim. The claim thus overlaps her disparate treatment claim to this extent, and summary judgment in Defendants' favor is appropriate with respect to this claim as well.

*Retaliation*

 Bailey alleges that the 1997 territory reduction was an act of retaliation by Defendants, arising from her complaint to Carol Costello, the human resources director at Synthes, about the sexually disparaging remarks that Gennett allegedly made about her.[6] The *McDon-*

---

6. To the extent Plaintiff also claims that she was called to a meeting early in 1996 and

criticized in retaliation for accusing Pendle-

*nell Douglas* burden-shifting framework applies in the retaliation context as well. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996). A plaintiff must first establish a *prima facie* case by showing that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* Although Defendants dispute whether Bailey's evidence is sufficient to establish that she complained to Costello about sexist remarks at all, the Court for purposes of this analysis construes Plaintiff's factual allegations in the light most favorable to her and therefore assumes that Plaintiff did complain to Costello about sexually disparaging remarks allegedly made by Gennett and thus engaged in protected activity. Bailey also asserts that she had told Pendlebury that she felt she was barraged with paperwork because she was an older woman. (Pl.Ex. 1 at 22.) A causal connection can be "established indirectly by showing that the protected activity was closely followed in time by adverse action." *Reed,* 95 F.3d at 1178. Here, the allegedly retaliatory territory reduction occurred nearly a year and a half after the Plaintiff allegedly engaged in the protected activity. The time period being so attenuated and Plaintiff having offered no other evidence from which a causal connection could reasonably be inferred, the Court finds that Bailey has not met her burden of establishing a *prima facie* case of retaliation. *See Nicastro v. Runyon,* 60 F.Supp.2d 181, 185 (S.D.N.Y.1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation"); *James v. Newsweek,* No. 96 Civ. 0393(LAP), 1999 WL 796173, at *15 (S.D.N.Y. Sept.30, 1999) (citing *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 84–85 (2d Cir.1990)) (a gap of four months between the protected activity and the adverse actions is "insufficient to establish causation"). Furthermore, even if the Court were to deem the connection sufficient to establish the *prima facie* case, Plaintiff's evidence is insufficient, for the reasons discussed at length above, to create a jury issue as to whether Defendants' proffered reasons for the territory reduction are pretextual. Summary judgment in favor of Defendants on the retaliation claim is therefore warranted.

*State Law Claims*

█ Plaintiff also asserts a state law breach of contract claim, arguing that Synthes breached a "promise" in its employment manual that it would not discriminate on the basis of race, age, gender or disability and a generalized duty of action in good faith. (Pl. Mem. in Opp. at 19.) Plaintiff acknowledges that there was no written employment agreement in place at the relevant times, and does not dispute that the cited employee manual states explicitly that employment is at will and includes a disclaimer of any intention to create an employment contract. (Def. Ex. 9 at D725, D728.) Nor does Plaintiff offer any evidence that any Defendant other than Synthes was a party to promises allegedly made in the employment manual. New York law, on which Plaintiff relies in her brief, recognizes that employment is, in the absence of a contract, at will, *Arledge v. Stratmar Sys., Inc.,* 948 F.2d 845, 849 (2d Cir.1991), and further upholds disclaimers of contractual creation through employment manuals. *Mirabella v. Turner Broad. Sys., Inc.,* No. 01 Civ. 5563(BSJ), 2003 WL 21146657, *2

bury of "harassing" her, the claim is untimely

for the reasons discussed above.

360

(S.D.N.Y. May 19, 2003) (citing *Lobosco v. New York Tel. Co./NYNEX*, 96 N.Y.2d 312, 317, 727 N.Y.S.2d 383, 751 N.E.2d 462 (N.Y.2001)) (under New York law "an express disclaimer of contractual rights in an employee manual bars an action for breach of contract based on the terms of the manual"). Plaintiff has thus failed to tender a viable legal basis for her breach of contract claim. Nor, for substantially the reasons discussed above, has she come forward with evidence creating any factual issue for trial as to whether Defendants' actions toward her constituted prohibited discrimination or action in bad faith with respect to her employment. Defendants are accordingly entitled to summary judgment on Plaintiff's contract claim as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety and the complaint is hereby dismissed as against all defendants. In light of the resolution of Defendants' summary judgment motion, the Court need not address their motion for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) as against certain defendants.

SO ORDERED.